IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

**UNDER SEAL**

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) | |
| INFORMATION ASSOCIATED WITH ) | |
| THE E-MAIL ADDRESSES LINKED TO ) | Case No. 1:25-sw-269 |
| APPLE ICLOUD ACCOUNTS ) | |
| THAT ARE STORED AT PREMISES ) | |
| CONTROLLED BY APPLE INC. ) | |

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, Ryan C. Daly, after being duly sworn, depose and state as follows:

1. I was the affiant on the affidavit in support of a warrant to search three Google Drive accounts, authorized on March 19, 2025. I attach that affidavit ("the March 19th Affidavit") to today's affidavit, and with one exception (explained below), I incorporate it here.

2. This affidavit in made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc (hereafter "Apple"), to disclose to the government records and other information, including the contents of communications, associated with the iCloud accounts linked to the e-mail addresses **d_garcia_4700@verizon.net, derekgarcia4700@gmail.com, congodeek101@gmail.com,** and **fatalattractionkennels@gmail.com,** and phone number **703-615-4602,** that are stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at One Apple Park Way, Cupertino, California. Based on the facts contained in this affidavit there is probable cause to believe that within the information associated with this account are records, documents, communications, contacts, messages, and other information, more particularly described on Attachment A (and incorporated here), related to a conspiracy to engage in an

animal fighting venture, in violation of 7 U.S.C. § 2156, 18 U.S.C. §§ 49(a) and 371, and false official statements, in violation of 18 U.S.C. § 1001.

3.    This affidavit is offered for the sole purpose of establishing probable cause to execute a search warrant of these Apple iCloud accounts and does not set forth all of the facts of this investigation.  The statements contained in this affidavit are based on the observations of fellow law enforcement agents, my background and experience, information obtained through other investigations, documents gathered during the course of this investigation, and interviews conducted during the course of this investigation.  When I write that an event occurred on a particular date, I mean to convey that it occurred "on or about" that date.

4.    In Paragraph 10 of the March 19th Affidavit, I wrote that, at the interview of Derek Garcia in April 2023, Garcia claimed not to know anyone named Mark Rodriguez.  Upon review of the notes pertaining to that interview, I realize that, in that paragraph of the March 19th Affidavit, I overstated what Garcia said.  Garcia did not expressly deny knowing anyone named Mark Rodriguez.  Instead, when shown a photograph of Mark Rodriguez, Garcia said that he did not know the actual name of the person in the photograph, but knew him only as "Poke."

Probable Cause

5.    As described in Paragraph 26 of the March 19th Affidavit, the email accounts derekgarcia4700@gmail.com, congodeek101@gmail.com, and fatalattractionkennels@ gmail.com, and the phone number 703-615-4602, are all controlled by Derek Garcia.

6.    Pursuant to the warrant issued upon the basis of the March 19th Affidavit, I found in Garcia's Google Drive accounts an email from Apple, dated July 6, 2024, titled "Your Apple ID password has been reset."  In part, the email read, "Dear Derek Garcia, The password for your Apple ID (d_garcia_4700@verizon.net) has been successfully reset." Accordingly, I know

2

that, as of July 2024, Garcia used that **d_garcia_4700@verizon.net** e-mail address to access his Apple iCloud account.

7.    On March 21, 2025, Apple confirmed the existence of Apple iCloud accounts associated with the email addresses **d_garcia_4700@verizon.net, derekgarcia4700 @gmail.com, congodeek101@gmail.com,** and **fatalattractionkennels@gmail.com,** and the phone number **703-615-4602,** and preserved the content of the accounts associated with each identifier.

8.    As described in Paragraphs 28 through 32 of the March 19th Affidavit, I believe the electronic media of Garcia will contain evidence of communications and/or photographs with Rodriguez, and help to establish that Garcia made false statements and representations to me when I interviewed him. Further, I believe that the electronic media of Garcia will contain evidence of communications that will lead me to identify additional dogfighters and members of the DMV Board.

### Facts About Apple

9.    Apple is a United States company that produces the iPhone, which uses the iOS operating system. Based on my training, experience, and participation in other investigations, I know that Apple provides a variety of services that can be accessed from an iPhone by linking the iPhone to an "Apple ID." An Apple ID is an account created either during setup of an Apple device, such as an iPhone, or through the iTunes or iCloud services and subsequently linked to the iPhone. A single Apple ID account can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

10.    As described in further detail below, the services accessible with an Apple ID account include instant messaging and file storage, including photo file storage. An Apple ID

3

takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

11.   I further know that:

a.   Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.   iMessage allows users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts.

c.   iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and can also be used to store iOS device backups and data associated with third-party apps. iCloud content may include stored photos, documents, contacts, calendars, iMessages, text (SMS) messages, and MMS messages.

d.   Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on

4

Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

e.  Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

f.  Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWorks and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).

5

iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud.

12.     Here, the communications and data stored in an Apple ID account may provide direct evidence of Garcia's false statements, as well as the involvement of others in a dogfighting conspiracy. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used by targets in furtherance of their criminal activity, including to communicate and facilitate the offenses under investigation.

13.     Therefore, Apple's servers are likely to contain stored communications and files regarding animal fighting. In my training and experience, such information may constitute evidence of the crimes under investigation.

<u>Information to be Searched and Things to be Seized</u>

14.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment A. Upon receipt of the information described in Section I of Attachment A, government-authorized persons will review that information to locate the items described in Section II of Attachment A.

6

## Conclusion

15.     Based on the foregoing there is probable cause to believe that within the Apple iCloud accounts linked to the e-mail addresses **d_garcia_4700@verizon.net, derekgarcia4700@gmail.com, congodeek101@gmail.com,** and **fatalattractionkennels @gmail.com,** and the phone number **703-615-4602** , there are records, documents, communications, messages, and other information, more particularly described on Attachment A, related to a conspiracy to engage in a dogfighting venture, in violation of 7 U.S.C. § 2156 and 18 U.S.C. §§ 49(a) and 371, and false official statements in violation of 18 U.S.C. § 1001.

16.     Wherefore, I request the issuance of a search warrant allowing agents to seize the information stored on the Apple iCloud accounts as described above, and in accordance with the search procedure described in Attachment A.

17.     Since this investigation is continuing, disclosure of this affidavit will jeopardize the progress of the investigation. Accordingly, I request that the Court issue an order that this affidavit be filed under seal.

FURTHER THIS AFFIANT SAYETH NOT.

*Ryan C. Daly*

_____
Ryan C. Daly
Special Agent, FBI

Subscribed and sworn to, in accordance
with Fed. R. Crim. P. 4.1, by telephone
on this 28th day of March 2025.

**Lindsey R Vaala** Digitally signed by Lindsey R Vaala
Date: 2025.03.28 10:45:32 -04'00'

_____
Lindsey R. Vaala
United States Magistrate Judge

7

## ATTACHMENT A

### Particular Things to be Seized

**I.     Information to be disclosed by Apple**

To the extent that information associated with the Apple ID account linked to e-mail addresses **d_garcia_4700@verizon.net, derekgarcia4700 @gmail.com, congodeek101 @gmail.com**, and **fatalattractionkennels@gmail.com**, and the phone number **703-615-4602** is within the possession, custody, or control of Apple, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for any Apple account linked to the addresses and phone number specified above:

1.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, methods of connecting, and means and source of payment (including any credit or bank account numbers);

2.     All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

3.     The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message; and

4.     The contents of all files and other records stored on iCloud and related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, and iCloud Photo Library, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks.

## II.    Information to be seized by the Government

All information described above in Section I that constitutes evidence of to a conspiracy to engage in an animal fighting venture, in violation of 7 U.S.C. § 2156, and 18 U.S.C. §§ 49(a) and 371, and false official statements, in violation of 18 U.S.C. § 1001, since 2008, including information pertaining to the following matters:

a.    Any and all records, notes, documents, correspondence or other information (including but not limited to text messages, voicemails, photographs, videos, and other digital files) concerning animal fighting or breeding or training animals for fighting;

b.    Any and all address books, names, and lists of names and addresses of individuals who may have been in contact with Garcia concerning animal fighting;

c.    Calendars, diaries, or other documents used to record schedules, meetings, conversations, or other events related to animal fighting venture or event;

d.    Location data or information which would provide evidence of an animal fighting venture;

e.    The identity of the person(s) who created or used the Google Drive account, including records that help reveal the whereabouts of such person(s);

f.    Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

g.    Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

h.    Evidence indicating the subscriber's state of mind as it relates to the crime under investigation; and

i.    Evidence that may identify any customers, co-conspirators, or aiders and abettors, including records that help reveal their whereabouts.

j.    Evidence of user attribution showing who used or owned the iPhone at the time the items described in this Attachment were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this declaration is true and correct. I am employed by Apple, Inc, and my official

title is _____. I am a custodian of records for Apple, Inc. I state

that each of the records attached hereto is the original record or a true duplicate of the original

record in the custody of Apple, Inc, and that I am the custodian of the attached records consisting

of _____ (pages/CDs/kilobytes). I further state that:

    a.    all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth, by, or from information transmitted by, a person with

knowledge of those matters;

    b.    such records were kept in the ordinary course of a regularly conducted business

activity of Apple, Inc; and

    c.    such records were made by Apple, Inc as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal

Rules of Evidence.

_____    _____

Date                Signature

10

# March 19th Affidavit

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| | | **UNDER SEAL** |
| IN THE MATTER OF THE SEARCH OF | ) | |
| INFORMATION ASSOCIATED WITH | ) | |
| THE GOOGLE IDs LINKED TO | ) | Case No. 1:25-sw-243 |
| THE E-MAIL ADDRESSES | ) | |
| CONGODEEK101@GMAIL.COM, | ) | |
| DEREKGARCIA4700@GMAIL.COM | ) | |
| FATALATTRACTIONKENNELS@GMAIL.COM) | | |
| THAT IS STORED AT PREMISES | ) | |
| CONTROLLED BY GOOGLE LLC | ) | |

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, Ryan C. Daly, after being duly sworn, depose and state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2015. As a Special Agent with the FBI, I am authorized to investigate crimes involving violations of federal law. I am currently assigned to investigate matters involving health care fraud and environmental offenses. As a result of my training and experience, I am familiar with tactics and methods used by individuals who engage in dogfighting. I am also familiar with many investigative techniques employed to investigate these acts, including search warrants for the search of e-mail accounts, computers, digital media, and associated media storage.

2.     This affidavit in made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google LLC (hereafter "Google"), to disclose to the government records and other information, including the contents of communications, associated with the Google Drive account linked to the e-mail addresses congodeek101@gmail.com, derekgarcia4700@gmail.com, and

**fatalattractionkennels@gmail.com**, that is stored at premises owned, maintained, controlled, or operated by Google, LLC, a company headquartered at 1600 Ampitheatre Parkway, Mountain View, California. Based on the facts contained in this affidavit there is probable cause to believe that within the information associated with this account are records, documents, communications, contacts, messages, and other information, more particularly described on Attachment A (and incorporated here), related to a conspiracy to engage in an animal fighting venture, in violation of 7 U.S.C. § 2156, 18 U.S.C. §§ 49(a) and 371, and false official statements, in violation of 18 U.S.C. § 1001.

3.     This affidavit is offered for the sole purpose of establishing probable cause to execute a search warrant of this Google Drive account and does not set forth all of the facts of this investigation. The statements contained in this affidavit are based on the observations of fellow law enforcement agents, my background and experience, information obtained through other investigations, documents gathered during the course of this investigation, and interviews conducted during the course of this investigation. When I write that an event occurred on a particular date, I mean to convey that it occurred "on or about" that date.

4.     Derek Aaron Garcia, 42, a resident of Woodbridge, Virginia, is employed as a supervisory fire suppression specialist at VSC Fire and Security. In November 2022, Garcia pled guilty in this Court to conspiracy to engage in an animal fighting venture, centered around the "DMV Board". On the DMV Board and among dogfighters, Garcia was known as "Deek" and/or "Fatal Attraction." In March 2023, Judge Brinkema sentenced Garcia to 10 days in jail, and three years of supervised release.

<<

<<

2

I.      The DMV Board

5.      On August 23, 2022, a grand jury in this district returned an indictment charging Derek Garcia, Michael Hilliard, Shaborn "Shy" Nesbitt, Ricardo "Rip" Thorne, LaRon "Frog" West, Charles "Chucky" Williams, III, and Tarry Jeron "TJ" Wilson, with conspiring with Carlos Harvey and Rodriguez Norman to engage in an animal fighting venture, in violation of 7 U.S.C. § 2156 and 18 U.S.C. §§ 49 and 371, and related substantive animal fighting charges. A copy of that indictment is attached to this affidavit. I am familiar with the facts that supported the return of that indictment, and I incorporate here by reference the facts alleged in the "General Allegations" and "Overt Acts" sections of that indictment.

6.      Of the defendants charged in that indictment, Nesbitt has not yet appeared on the charges in this district, because he is in custody in the Eastern District of North Carolina after entering a guilty plea for unrelated drug charges there. In November 2022, however, Garcia, Hilliard, Thorne, West, and Williams each entered guilty pleas and admitted to engaging in the animal fighting venture alleged in the indictment and were subsequently sentenced for their roles in the conspiracy; Wilson entered a guilty plea in April 2023 and was sentenced in June 2023.

7.      Pursuant to their guilty pleas, Garcia, Hilliard, Thorne, West, Williams, and Wilson each admitted that they used the secure messaging app known as "Telegram" to create and use private groups that they generally referred to as "the DMV Board" or "the Board", where they and their associates could discuss training fighting dogs, exchange videos about dogfighting, and arrange and coordinate dog fights, away from the view of law enforcement authorities. Each admitted that they and the other members of the DMV Board also used the Telegram app to compare methods of killing dogs that lost fights, as well as to circulate media

3

reports about dogfighters who had been caught by law enforcement, and discuss methods to minimize the likelihood that they would be caught themselves.[1]

8.     On April 8, 2024, in a trial before Judge Brinkema in this district, Mark "Slow Poke" Rodriguez, a resident of Stafford, Virginia, was convicted for his role in the DMV Board conspiracy.  At trial, Rodriguez stipulated that he was known as "Slow Poke." Proof at trial established that, between 2015 and 2022, Rodriguez arranged dogfights, refereed dogfights, provided summaries of dogfights to publications tracking the results of dogfights, and facilitated the sale of the frozen semen of fighting dogs. According to friends and family of Rodriguez with whom I have spoken, he has used the name "Slow Poke" for more than 25 years.

II.     False Statements by Derek Garcia

9.     As alleged in Paragraph 10 of the General Allegations of the attached indictment, the DMV Board contained as many as 28 members at one time.  As the prosecutions of the seven defendants named in the indictment has proceeded, I continued to try to identify other members of the DMV Board and others associated with the conspiracy to engage in an animal fighting venture. As part of these efforts, and after Judge Brinkema sentenced Garcia for his role in the DMV Board conspiracy, I interviewed Garcia in the presence of his attorney at the U.S. Attorney's Office in Alexandria, Virginia. The conditions of the interview included that the government could prosecute Garcia for any false statements that he made during that interview.

---

[1] In case 1:17cr312, Rodriguez Norman pled guilty in this district to conspiring to engage in dog fighting.  It was the wiretap on his phone that led investigators initially to learn about the DMV Board. In case 3:21cr023, Carlos Harvey pled guilty to the same offense. It was the wiretap on his phone that enabled investigators to record hours and hours of communications on the Telegram app between members of the DMV Board.

4

10.    At the interview, Garcia claimed not to know anyone named Mark Rodriguez. I showed Garcia a photo of Rodriguez and asked if he recognized the face in the photo. Garcia said that he recognized the fellow but barely knew him. Garcia said that he did not know the fellow's true name and spoke to him only a few times after meeting him on the street walking a dog.

11.    I believe that Garcia's statements about Rodriguez were false. In 2022 and 2024, I spoke with Rodriguez's older sister ("Sister"), who identified Garcia as one of Rodriguez's friends from their days in high school. Sister said that, according to her parents, Garcia attended a memorial service in 2022 marking the death of Sister's daughter (Rodriguez's niece) after a drug overdose that occurred in Rodriguez's residence on Doc Stone Road.

12.    I spoke with Rodriguez's parents ("Parents") in March 2025, and they told me that Garcia, was, in fact, at the memorial service in 2022 for their granddaughter. Parents said that Derek was at the service with his wife, Joni, and speaking with Rodriguez. Parents also told me that Garcia and Rodriguez were friends since high school. I conclude from Garcia's attendance at that memorial service that Garcia must still remember Rodriguez.

13.    Sister's and Parents' statements that Rodriguez and Garcia were old friends is corroborated by records found among materials seized from other DMV Board members. For example, records found in the iCloud account of DMV Board member Charles Davis indicate that Rodriguez was closely associated in a dogfighting venture with Garcia. For example, in 2017, Davis sent a text message to another dogfighter referencing a fight in which a dog named "Pee Wee" beat a dog belonging to Rodriguez and Garcia.

14.    The long-standing and close association between Garcia and Rodriguez also is corroborated by two messages I found in the contents of Rodriguez's Hotmail account, that

5

Rodriguez received from Garcia in December 2008, and that Rodriguez sent to Garcia in April 2010. Garcia was using email address d_garcia_4700@verizon.net. The first message contained the photos of six fighting dogs, three of which Garcia described in the message to Rodriguez as related to "gambino." Pedigrees of fighting dogs available online at the Pedigrees Online website show that "Gambino" was a dog owned by Davis - - and that "Gambino" was the sire of four fighting dogs owned by Garcia. The second message contained a video titled "Zilla swimming" and featured a pitbull type dog chained to some sort of harness and swimming in what appears to be a pool.

15.     The association between Garcia and Rodriguez is further evidenced by a recording found on a phone seized in August 2020 from DMV Board member Wilson. That recording (later played at Rodriguez's trial) from July 2020 preserved a voice communication over Telegram between Wilson and another convicted dogfighter, Carlos Warren. Warren distributed a magazine dedicated to dogfighting. To gain Wilson's trust, Warren told Wilson that he (Warren), Rodriguez, and Garcia were all "good friends together."

16.     Based on phone records provided by Verizon, I was able to see that, between October 2016 and September 2017, Garcia and Rodriguez communicated almost 100 times via traditional voice calls or text messages. During these communications, Rodriguez used a phone number under Lisa Vargo's name ending in 0311, but he stipulated that he used and controlled the phone number during his trial.

17.     The investigation into Rodriguez also revealed that he used a third and less known phone number ending in 4787, which was a Google VOIP number, for dog fighting purposes. A review of the toll records for this number revealed that Garcia also contacted Rodriguez on this number in July 2019.

6

18.     Lastly, CashApp user "Deek" sent $1,600 over five separate transactions between September 2020 and June 2021 to the CashApp account that Rodriguez used. I know "Deek" to be an alias used by Garcia after seeing that name listed in the contacts lists of multiple DMV Board members with Garcia's phone number.

III.     Mark Rodriguez's Phone Communications About Garcia

19.     In December 2024, I executed a search warrant at Rodriguez's residence to obtain evidence related to disobedience or resistance to a court's lawful writ, process, order, rule, decree, or command in violation of 18 U.S.C. § 401(3), a conspiracy to engage in a dogfighting venture, in violation of 7 U.S.C. § 2156 and 18 U.S.C. §§ 49(a) and 371; and false statements, in violation of 18 U.S.C. § 1001. During this search, the FBI seized four cell phones belonging to Rodriguez and his long-term girlfriend, Lisa Vargo. The FBI was able to gain access to all of the phones. One of Rodriguez's phones contained a home screen photo of a skeleton man with a skeleton dog (the "Skeleton Phone").

20.     During my review of the Skeleton Phone, I discovered a Telegram conversation between Rodriguez and Vargo from April 10, 2021 pertaining to a CashApp transaction. At 9:27pm, Rodriguez instructed Vargo to check her CashApp. A review of Vargo's CashApp on April 10, 2021 revealed a $125 transaction from "Deek" at approximately 9:23pm. These exchanges lead me to believe that Rodriguez and Garcia were making some kind of arrangement in real time and indicate a closer relationship than Garcia told me when I interviewed him.

21.     In a separate Telegram conversation between Rodriguez and Vargo on June 18, 2021, Rodriguez coordinated the purchase and delivery of THC gummies to an inebriated Vargo while Rodriguez was out of town. Rodriguez wrote, "D will be bringing them down. But give him time cuz of getting them AND traffic. He needs to wait until traffic dies down." I know "D"

7

is one of the name's Rodriguez calls Garcia. The fact that Garcia was willing to purchase drugs and deliver them to Vargo while Rodriguez was out of town tells me that Rodriguez trusts Garcia a great deal, and that Garcia was willing to help Rodriguez in his absence, characteristics indicative of a closer and more intimate relationship than what Garcia told me.

22.    On March 24, 2022, I interviewed Garcia's father-in-law, Clifford Wood, at his residence on Macwood Drive in Woodbridge, Virginia. On March 24, 2022, Rodriguez sent Vargo a message in Telegram that read in part, "D just told me that the Feds came by Joni's Dad's place asking for him." Again, someone who barely knows another person does not take time to notify that person of an interaction with law enforcement within a matter of hours, especially when that person was not mentioned during the interaction.

23.    On September 19, 2023, I served Rodriguez with a "Target Letter" for his involvement in the DMV Board. On September 22, 2023, Rodriguez sent "Joni", a woman I know to be married to Garcia, an encrypted message in Telegram that read in full, "Promise me that once everything passes for us both that you and D will consider a small cruise with us. It can just be a couples cruise with just Lisa and I." I believe Rodriguez was referring to his pending indictment and to Garcia's current probation as a result of his conviction pertaining to the DMV Board.

24.    On February 6, 2024, Rodriguez sent "Joni" a message in Telegram accompanied with a news article. Rodriguez's message said in part, "That's the dude Blue. D sold him a dog about 10 years or more ago."

25.    On March 31, 2024, Rodriguez sent another Telegram message to "Joni" in response to an evening out with Rodriguez, Vargo, and the Garcias that Rodriguez picked up the restaurant bill. The message read in full, "It's all good. We appreciated the invite and spending

8

time with you guys. It made it better it was on a Saturday since D and I haven't been out on a Saturday in a long time." I believe this comment to mean that Garcia and Rodriguez spent a lot of time together in the past; accordingly, I suspect that there will be photos and/or communications in the Target Accounts to commemorate the time spent together with Rodriguez and Vargo.

IV.    The Target Accounts

26.    According to records I received from Google in March 2025, Derek Garcia has been the subscriber for the e-mail address **derekgarcia4700@gmail.com** since 2013. The Google Account ID associated with **derekgarcia4700@gmail.com** is 804985350083. According to records I received from Google in March 2025, Deek G has been the subscriber for the e-mail address **congodeek101@gmail.com** since 2012. The Google Account ID associated with **congodeek101@gmail.com** is 782346878653. The recovery phone number associated with **congodeek101@gmail.com** is 703-615-4602, a number I know Garcia to be attributable to Garcia. According to records I received from Google in March 2025, Fatal D has been the subscriber for the e-mail address **fatalattractionkennels@gmail.com** since 2011. The Google Account ID associated with **fatalattractionkennels@gmail.com** is 488826819926. Garcia used the kennel name Fatal Attraction to identify his dog fighting operation.

27.    In records sent to me by Google in March 2025, Google confirmed the existence of the following, relevant services, among others, associated with each account:

| Account | features |
| --- | --- |
| **congodeek101@gmail.com** | Web and App Activity, Gmail, Google Photos, Google Drive |
| **fatalattractionkennels@gmail.com** | Web and App Activity, Gmail, Location History |
| **derekgarcia4700@gmail.com** | Web and App Activity, Gmail, Google Drive, Google Docs |

## V.    Evidence Will Exist in the Target Accounts

28.    As explained above, Garcia and Rodriguez maintained a long-standing and close association involving dogfighting and close friendship - - and Garcia's statements to me in April 2023 to the contrary were false.  I believe the electronic media of Garcia will contain evidence of communications and/or photographs with Rodriguez, and help to establish that Garcia made false statements and representations to me when I interviewed him.  Further, I believe that the electronic media of Garcia will contain evidence of communications that will lead me to identify additional dogfighters and members of the DMV Board.

29.    Based on my training, experience, and on the investigation I have conducted so far, I know that dog fighters associated with the DMV Board communicate via email, text messages, and the Telegram app.  Dog fighters routinely hook matches and exchange documents, tips, photographs, or videos relating to dog fighting activities via electronic means. Dog fighters exchange videos, for example, to demonstrate the strength and gameness of their dogs.

30.    In the course of the investigation, my colleagues and I have obtained warrants to examine the phones, Google Drive, and/or the iCloud accounts of Norman, Davis Jr., Harvey, Nesbitt, Rodriguez, West, Williams, and Wilson, among others.  The accounts of each of those individuals contained evidence of their involvement in general, and with the DMV Board in specific.  Each contained contact information (at least "monikers" and/or kennel names) for other members of the DMV Board, and several contained descriptions of fights that had been posted to the DMV Board, and text messages that had been exchanged on the DMV Board.  Each

10

contained photos or videos of fighting dogs, including dogs that belonged to their fellow DMV Board members.

31.     Further, the FBI previously executed two search warrants in December 2018, for iCloud accounts used by convicted conspirators West and Williams, and multiple search warrants in 2023 and 2024, for iCloud accounts used by indicted conspirators Alston, Davis Jr, Jackson, Loatman, McDougald, and Wallace, among others. All of the iCloud accounts contained evidence related to a conspiracy to engage in a dogfighting venture. The FBI also executed two search warrants for Rodriguez's Google Drive and indicted conspirator in the District of Maryland, Anthony Knight's Google Drive, both of which contained evidence of a dog fighting conspiracy.

32.     As I was able to locate dog fighting communications with Garcia and contact information for Garcia in multiple iCloud accounts or devices of other DMV Board members as recently as 2023, to include but not limited to Charles Davis Jr, Rodriguez Norman, and TJ Wilson, and that Garcia had CashApp transactions with Alston as recently as June 2021 and CashApp transactions with TJ Wilson as recently as August 2022, I believe the Garcia Google Drive accounts will produce similar results and provide additional details as to where he was participating in animal fighting ventures and his relationship with Rodriguez. On the basis of this experience, I believe that the Google Drive accounts of Derek Garcia also are likely to contain recent contact information for DMV Board members, as well as communications with them, and photos, reports of dog fights, and videos of fighting dogs belonging to Garcia or other members of the DMV Board.

<<

<<

11

## VI.    Facts About Google LLC

33.    Google, LLC is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

34.    In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

35.    Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

36.    Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

12

37.    Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

38.    Google provides an address book for Google Accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user deletes them. Contacts can be accessed from the same browser window as other Google products like Gmail and Calendar.

39.    Google provides an appointment book for Google Accounts through Google Calendar, which can be accessed through a browser or mobile application. Users can create events or RSVP to events created by others in Google Calendar. Google Calendar can be set to generate reminder emails or alarms about events or tasks, repeat events at specified intervals, track RSVPs, and auto-schedule appointments to complete periodic goals (like running three times a week). A single Google Account can set up multiple calendars. An entire calendar can be shared with other Google Accounts by the user or made public so anyone can access it. Users have the option to sync their mobile phone or device calendar so it is stored in Google Calendar.

13

Google preserves appointments indefinitely, unless the user deletes them. Calendar can be accessed from the same browser window as other Google products like Gmail and Calendar.

40.     Google provides several messaging services including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user hasn't disabled that feature or deleted the messages, though other factors may also impact retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.

41.     Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides, (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit. Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One. In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder called "Shared with me." Google preserves files stored in Google Drive indefinitely, unless the user deletes them.

14

42.    Google Keep is a cloud-based notetaking service that lets users take notes and share them with other Google users to view, edit, or comment. Google Keep notes are stored indefinitely, unless the user deletes them.

43.    Google offers a cloud-based photo and video storage service called Google Photos. Users can share or receive photos and videos with others. Google Photos can be trained to recognize individuals, places, and objects in photos and videos and automatically tag them for easy retrieval via a search bar. Users have the option to sync their mobile phone or device photos to Google Photos. Google preserves files stored in Google Photos indefinitely, unless the user deletes them.

44.    Google offers a map service called Google Maps which can be searched for addresses or points of interest. Google Maps can provide users with turn-by-turn directions from one location to another using a range of transportation options (driving, biking, walking, etc.) and real-time traffic updates. Users can share their real-time location with others through Google Maps by using the Location Sharing feature. And users can find and plan an itinerary using Google Trips. A Google Account is not required to use Google Maps, but if users log into their Google Account while using Google Maps, they can save locations to their account, keep a history of their Google Maps searches, and create personalized maps using Google My Maps. Google stores Maps data indefinitely, unless the user deletes it.

45.    Google collects and retains data about the location at which Google Account services are accessed from any mobile device, as well as the periodic location of Android devices while they are in use. This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. According to Google, this location data may

15

be associated with the Google Account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking. The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google Account is in New York because it conducts a series of searches about places to eat in New York and directions from one New York location to another. Precision location data is typically stored by Google in an account's Location History and is assigned a latitude-longitude coordinate with a meter radius margin of error. Inferential data is stored with an account's Web & App Activity. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes it or opts to automatically delete their Location History and Web & App Activity after three or eighteen months. Accounts created after June 2020 auto-delete Location History after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

46.     Google offers a free web browser service called Google  hrome which facilitates access to the Internet.   hrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on  hrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called    y Activity.

4 .     Google offers a service called Google Voice through which a Google Account can be assigned a telephone number that can be used to make, record, and forward phone calls and send, receive, store, and forward S  S and      S messages from a web browser, mobile phone,

16

or landline. Google Voice also includes a voicemail service. Records are stored indefinitely, unless the user deletes them.

48.    Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

49.    When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

50.    Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the

17

account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

51.    Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

52.    In my training and experience, evidence of who was using a gmail account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

53.    For example, the stored communications and files connected to a gmail account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

54.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing

18

a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

55.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

56.    Other information connected to a gmail account may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

57.    Here, the communications and data stored in a gmail account may provide direct evidence of contacts with Rodriguez and other dogfighters. Furthermore, account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive

19

and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

58.     Therefore, in light of the information about the DMV Board and Rodriguez described above, Google's servers are likely to contain stored communications and files regarding Garcia's relationship with Rodriguez, as well as other dogfighters who have yet to be identified. In my training and experience, such information may constitute evidence of the crimes under investigation.

VII.     Information to be Searched and Things to be Seized

59.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment A. Upon receipt of the information described in Section I of Attachment A, government-authorized persons will review that information to locate the items described in Section II of Attachment A.

60.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

<<

<<

<<

20

## Conclusion

61.     Based on the foregoing there is probable cause to believe that within the Google Drive accounts linked to the e-mail addresses **congodeek101@gmail.com**, **derekgarcia4700@gmail.com**, and **fatalattractionkennels@gmail.com**, there are records, documents, communications, messages, and other information, more particularly described on Attachment A, related to false official statements in violation of 18 U.S.C. § 1001, and a conspiracy to engage in a dogfighting venture, in violation of 7 U.S.C. § 2156 and 18 U.S.C. §§ 49(a) and 371.

62.     Wherefore, I request the issuance of a search warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure allowing agents to seize the information stored on the Garcia Google Drive accounts as described above, and in accordance with the search procedure described in Attachment A.

63.     Since this investigation is continuing, disclosure of this affidavit will jeopardize the progress of the investigation. Accordingly, I request that the Court issue an order that this affidavit be filed under seal.

FURTHER THIS AFFIANT SAYETH NOT.

*Ryan C. Daly*
_____
Ryan C. Daly
Special Agent, FBI

Subscribed to and sworn before me on this 19th day of March, 2025.

_____
Ivan D. Davis
United States Magistrate Judge

21

## ATTACHMENT A

### Particular Things to be Seized

**I.    Information to be disclosed by Google**

To the extent that information associated with the Google Drive accounts linked to the e-mail addresses **congodeek101@gmail.com (Google ID 782346878653),** **derekgarcia4700@gmail.com (Google ID 804985350083),** and **fatalattractionkennels@gmail.com (Google ID 488826819926)** is within the possession, custody, or control of Google, including any messages, records, files, logs, or information that have been deleted but are still available to Google, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Google is required to disclose the following information to the government, in unencrypted form whenever available, for any Google account linked to linked to the e-mail addresses **congodeek101@gmail.com, derekgarcia4700@gmail.com,** and **fatalattractionkennels@gmail.com:**

a.    All business records and subscriber information, in any form kept, pertaining to the Account, including:

1.    Names (including subscriber names, user names, and screen names);
2.    Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);
3.    Telephone numbers, including SMS recovery and alternate sign-in numbers;
4.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;
5.    Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers
6.    Length of service (including start date and creation IP) and types of service utilized;
7.    Means and source of payment (including any credit card or bank account number); and
8.    Change history.

b.    All device information associated with the Account, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers.

c.  Records of user activity for each connection made to or from the Account(s), including, for all Google services, the date, time, length, and method of connection, data transfer volume, user names, source and destination IP address, name of accessed Google service, and all activity logs.

d.  The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the size, length, and timestamp of each email; and true and accurate header information including the actual IP addresses of the sender and recipients of the emails.

e.  All forwarding or fetching accounts relating to the accounts.

f.  Any records pertaining to the user's contacts, including: address books; contact lists; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history.

g.  Any records pertaining to the user's calendar(s), including: Google Calendar events; Google Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event invitation, reminder, appointment, or task; user settings; and all associated logs and change history.

h.  The contents of all text, audio, and video messages associated with the account, including Chat, Duo, Hangouts, Meet, and Messages (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history.

i.  The contents of all records associated with the account in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes and note titles, lists, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; SMS data and device backups; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other Google service (such as Google Classroom or Google Group), or third-party application associated with each record; and all associated logs, including access logs and IP addresses, of each record.

j.  The contents of all media associated with the account in Google Photos, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs of each record, including the creation and change history, access logs, and IP addresses.

23

k.  All maps data associated with the account, including Google Maps and Google Trips, including: all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history.

l.  All Location History and Web & App Activity indicating the location at which the account was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history.

m.  All Internet search and browsing history, and application usage history, including Web & App Activity, Voice & Audio History, Google Assistant, and Google Home, including: search queries and clicks, including transcribed or recorded voice queries and Google Assistant responses; browsing history, including application usage; bookmarks; passwords; autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; user settings; and all associated logs and change history.

n.  All records, content, and other information relating to YouTube use and access, including, but not limited to, associated videos (including records of uploads, shares, views, edits, comments, likes, and other interaction; and copies of videos uploaded to, shared by, or shared with the account), searches (including search terms), channels, subscriptions and subscribers, playlists, connected apps, user settings, friends and other contacts (including the content of all communications), deletions and other changes, and, for videos, URL, metadata, privacy and other settings, size, title, description, duration, tags, timestamps, IP addresses, location information, and the account or other identifier of the user who uploaded the video; video and channel performance information, including all analytics on content, reach, engagement, audience, revenue, and research; and, for all of the above, all related logs, IP addresses, timestamps, and device identifiers.

Google is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

24

## II.    Information to be seized by the Government

All information described above in Section I that constitutes evidence of false statement regarding a relationship with Mark Rodriguez, in violation of 18 U.S.C. § 1001, and/or a conspiracy to engage in an animal fighting venture, in violation of 7 U.S.C. § 2156, and 18 U.S.C. §§ 49(a) and 371, since 2008, including information pertaining to the following matters:

a.    Any and all records, notes, documents, correspondence or other information (including but not limited to text messages, voicemails, photographs, videos, and other digital files) concerning Mark Rodriguez, animal fighting or breeding or training animals for fighting;

b.    Any and all address books, names, and lists of names and addresses of Mark Rodriguez and/or individuals who may have been in contact with Garcia concerning animal fighting;

c.    Calendars, diaries, or other documents used to record schedules, meetings, conversations, or other events related to Mark Rodriguez and/or animal fighting venture or event;

d.    Location data or information which would provide evidence of meetings with Mark Rodriguez and/or an animal fighting venture;

e.    The identity of the person(s) who created or used the Google Drive account, including records that help reveal the whereabouts of such person(s);

f.    Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

g.    Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

h.    Evidence indicating the subscriber's state of mind as it relates to the crime under investigation; and

i.    Evidence that may identify any customers, co-conspirators, or aiders and abettors, including records that help reveal their whereabouts.

25

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Google, LLC, and my official title is _____. I am a custodian of records for Google, LLC. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Google, LLC., and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.    such records were kept in the ordinary course of a regularly conducted business activity of Google, LLC; and

c.    such records were made by Google, LLC as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____        _____
Date                            Signature

26

# Exhibit 1

AUG 2 3 2022

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA

       v.

DEREK AARON GARCIA,

MICHAEL ROY HILLIARD,

SHABORN AMAR "SHY" NESBITT,

RICARDO GLENN "RIP" THORNE,

LARON MECCO "FROG" WEST,

CHARLES EDWARD "CHUCKY" WILLIAMS, III,

TARRY JERON "TJ" WILSON,

           Defendants.

Criminal No. 1:22-cr-154

Count 1:  18 U.S.C. § 371 (Conspiracy)

Counts 2-4:  7 U.S.C. 2156(b) and 18 U.S.C. § 49 (Training and Transporting Dogs for Participation in an Animal Fighting Venture)

Count 5:  7 U.S.C. 2156(c) and 18 U.S.C. § 49 (Advertising a Dog For Use in an Animal Fighting Venture)

INDICTMENT

AUGUST 2022 TERM -- AT ALEXANDRIA

THE GRAND JURY CHARGES THAT:

GENERAL ALLEGATIONS

A. Animal Fighting Ventures and Dogfighting

1. The federal Animal Welfare Act defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least two animals for purposes of sport, wagering, or entertainment." It is illegal to sponsor or exhibit an animal in an animal fighting venture.  It is also illegal to possess, train, sell,

buy, transport, deliver or receive an animal for purposes of having the animal participate in an animal fighting venture.

2. In the United States, dog fighting ventures almost always involve "pit bull"-type dogs, which dog fighters prefer for their compact muscular build, short coat, and the aggression that some display toward other dogs. Generally, a dog fight occurs when two dogs are released by their handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

3. Generally, dog fighters fight dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs, which is achieved by winning three or five fights, respectively.

4. Because of their conditioning and training, dogs used in animal fighting ventures are almost always housed separately from other dogs – in pens, cages, or on chains, so that they will not hurt or kill other dogs when the handler is absent. Heavy chains are often used when restraining dogs to develop neck strength in dogs used for fighting purposes.

5. Generally, dog fighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits. Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury. Dogs displaying these attributes are often bred with other dogs displaying similar traits to enhance the bloodline of these dogs for fighting purposes. Dog fighters generally keep such dogs solely for fighting purposes.

2

6. Dogs who have been fought may have scars, puncture wounds, swollen faces, or mangled ears. Scars from organized dog fights are commonly found on the face and front legs, as well as on hind ends and thighs.

7. Dogs that lose fights or fail to show "gameness" are often killed. It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment.

8. Once a dog fighter locates an opponent and agrees upon terms, the match is "hooked," or set up. The dog then typically undergoes a conditioning process dog handlers refer to as a "keep." A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a training program including treadmills used to run and exercise the dogs away from public view; weight pulls used to increase the dog's strength and stamina; devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression; and the administration of drugs, vitamins, and other medicine. Some of the drugs used include steroids to build muscle mass and aggression. Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches, requiring close attention to a dog's routine. Training can take place at a dog fighter's "yard" or indoors away from public view.

B.    "The DMV Board" or "The Board"

9. It can be challenging for dog fighters to find an opponent with a dog of the same weight and sex who is looking to fight that dog at the same time of year, and for a wager that is mutually agreeable to both parties. For that reason, dog fighters rely heavily on each other and on extensive networks of contacts to find an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year. The practice is known as "calling out a weight." Dog fighters often "call out a weight" to known dog fighters in several states, to increase their odds of finding a match. "Calling out a weight" is often done over the internet.

3

10. To maintain contact with each other to discuss dogfighting, to exchange videos about dogfighting, and to arrange dogfights away from the view of law enforcement, the defendants and their conspirators created on the Telegram app private groups they generally referred to as "The DMV Board" or "The Board". The private groups generally referenced as The DMV Board or The Board had as many as 28 members at one time, including defendants DEREK AARON GARCIA, MICHAEL ROY HILLIARD, SHABORN AMAR "SHY" NESBITT, RICARDO GLENN "RIP" THORNE, LARON MECCO "FROG" WEST, CHARLES EDWARD "CHUCKY" WILLIAMS, III, and TARRY JERON "TJ" WILSON, unindicted conspirators Carlos Harvey and Rodriguez Norman, and other unindicted conspirators known as "Abstract", "Big Fist", "Big Head", and "Deep in the Game". The "DMV" designation on the private group name refers to the common location of many members of the group in Virginia, Maryland, and the District of Columbia.

11. The defendants and their conspirators used private groups on the Telegram App generally referenced as "The DMV Board" or "The Board" to communicate about dogfighting with each other daily, often throughout the day. Through the private groups on the Telegram App generally referenced as "The DMV Board" or "The Board" they discussed training techniques to maximize their chances of developing champion fighting dogs; discussed dogfights in which they entered dogs; recounted dogfights that they had seen; watched together and commented on videos of dogfights; "called out weights" to find dogfighting matches; offered and accepted bets on dog fights; recruited each other to officiate at dog fights; discussed the proper procedures for officials to use at dog fights; compared methods of killing dogs that lost fights; discussed which dog fighters could be trusted to join the group; circulated media reports about dogfighters who had been caught by law enforcement, and discussed methods to minimize the likelihood that they would be caught themselves.

12. In their communications on the private groups on the Telegram App generally referenced as "The DMV Board" or "The Board" the defendants and the unindicted conspirators identified below used the following names to refer to themselves and/or their dogfighting operations:

| Individual | Name(s) Used |
|---|---|
| DEREK AARON GARCIA | "Fatal Attraction" or "Derek" |
| Carlos Harvey | "Roc9" |
| MICHAEL ROY HILLIARD | "No Dayz Off", "No Dayz", or" Roy" |
| Rodriguez Norman | "Tough Love" |
| SHABORN AMAR "SHY" NESBITT | "The God I Am", "Mike Honcho" "Suge Thesenuts" or "Shy" |
| RICARDO GLENN "RIP" THORNE | "Darkside" or "Rip" |
| LARON MECCO "FROG" WEST | "Get Sick" or "Frog" |
| CHARLES EDWARD "CHUCKY" WILLIAMS, III | "Never Say Never" or "Chucky" |
| TARRY JERON "TJ" WILSON | "City Limits" |

## COUNT ONE

### (Dog fighting Conspiracy)

A. The general allegations of this Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

From in and around May 2015, and continuing to in and around August 2020, in Woodbridge in the Eastern District of Virginia and elsewhere, the defendants, DEREK AARON GARCIA, MICHAEL ROY HILLIARD, SHABORN AMAR "SHY" NESBITT, RICARDO GLENN "RIP" THORNE, LARON MECCO "FROG" WEST, CHARLES EDWARD "CHUCKY" WILLIAMS, III, and TARRY JERON "TJ" WILSON, did knowingly and unlawfully conspire with each other and with Anthony "Monte" Gaines, Carlos Harvey, Rodriguez Norman, and others, known and unknown to the Grand Jury, including individuals known as "Abstract", "Big Head", and "Deep in the Game", to commit the following offenses:

5

a.   To sponsor and exhibit dogs in animal fighting ventures, in violation of Title 7, United States Code, Section 2156(a), and Title 18, United States Code, Section 49(a);

b.   To sell, buy, possess, train, transport, deliver, and receive dogs for purposes of having the dogs participate in animal fighting ventures, in violation of Title 7, United States Code, Section 2156(b), and Title 18, United States Code, Section 49(a); and

c.   To use instrumentalities of interstate commerce for commercial speech for purposes of advertising animals for use in animal fighting ventures, promoting and in other manners furthering animal fighting ventures, in violation of Title 7, United States Code, Section 2156(c), and Title 18, United States Code, Section 49(a).

Ways, Manner and Means of the Conspiracy

The manner and means by which the defendants and their conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

1.   It was a part of the conspiracy that defendants and their conspirators bred, trained, and used pit bull-type dogs for dog fights.

2.   It was a part of the conspiracy that defendants and their conspirators agreed to breed their pit bull-type dogs to pit bull-type dogs owned by their conspirators in the hopes of breeding champion dog fighters.

3.   It was a part of the conspiracy that defendants and their conspirators kept at their properties and trained fighting dogs owned by themselves as well as by other conspirators.

6

4. It was a part of the conspiracy that defendants and their conspirators traveled to dog fights held at properties owned and/or arranged by themselves or other conspirators.

5. It was a part of the conspiracy that defendants and their conspirators bet on dog fights in which were entered dogs bred, trained, or owned by the defendants and their conspirators.

6. It was a further part of the conspiracy that the defendants and their conspirators used cell phones and direct messages to discuss dogfights, dogfighting, breeding fighting dogs, training techniques to maximize their chances of developing champion fighting dogs, and methods to avoid being caught by law enforcement.

7. It was a further part of the conspiracy that the defendants and their conspirators created and used on the Telegram app private groups they generally referred to as "The DMV Board" or "The Board" as places where they and their associates could discuss training fighting dogs, exchange videos about dogfighting, and arrange and coordinate dog fights, away from the view of law enforcement authorities.

8. It was a further part of the conspiracy that, on the Telegram app private groups generally referenced as the "DMV Board" or "The Board", the defendants and their conspirators used the names of their dogfighting operations and/or kennels to refer to themselves as well as to their dogfighting operations and/or kennels.

9. It was a further part of the conspiracy that the defendants and their conspirators used the Telegram app private groups they generally referenced as "The DMV Board" or "The Board" to discuss and compare training techniques to maximize their chances of developing champion fighting dogs.

7

10. It was a further part of the conspiracy that the defendants and their conspirators used the Telegram app private groups they generally referenced as "The DMV Board" or "The Board" to called out weights" to find dogfighting matches.

11. It was a further part of the conspiracy that the defendants and their conspirators used the Telegram app private groups they generally referenced as "The DMV Board" or "The Board" to offer and accept bets on dog fights.

12. It was a further part of the conspiracy that the defendants and their conspirators used the Telegram app private groups they generally referenced as "The DMV Board" or "The Board" to recruit each other to officiate at dog fights.

13. It was a further part of the conspiracy that the defendants and their conspirators used the Telegram app private groups they generally referenced as "The DMV Board" or "The Board" to compare methods of killing dogs that lost fights.

14. It was a further part of the conspiracy that the defendants and their conspirators used the Telegram app private groups they generally referenced as "The DMV Board" or "The Board" to discuss which dog fighters could be trusted to join the group.

15. It was a further part of the conspiracy that the defendants and their conspirators used the Telegram app private groups they generally referenced as "The DMV Board" or "The Board" to circulate media reports about dogfighters who had been caught by law enforcement and discuss methods to minimize the likelihood that they would be caught themselves.

## Overt Acts

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, the defendants and their conspirators committed overt acts including but not limited to the following:

1. On or about May 28, 2015, TARRY JERON "TJ" WILSON posted on an on-line website tracking pedigrees of fighting dogs a page with a photo and information for his fighting dog "City Limits Mayweather", characterizing the dog as the offspring of "Never Say Never & City Limits Beaty Bead 1XW".

2. In a phone conversation on or about October 18, 2015, RICARDO GLENN "RIP" THORNE told unindicted conspirator Anthony "Monte" Gaines that THORNE purchased "Hit Man," for breeding from LARON MECCO "FROG" WEST after WEST "rolled" (used as a sparring partner) "Hit Man" against "Cody" (another dog).

3. In a phone conversation on or about October 19, 2015, LARON MECCO "FROG" WEST told unindicted conspirator Anthony "Monte" Gaines that WEST was supplying fighting dogs to RICARDO GLENN "RIP" THORNE.

4. In a phone conversation on or about October 28, 2015, RICARDO GLENN "RIP" THORNE told unindicted conspirator Anthony "Monte" Gaines that THORNE was housing a fighting dog for LARON MECCO "FROG" WEST.

5. In a phone conversation on or about October 28, 2015, RICARDO GLENN "RIP" THORNE told unindicted conspirator Anthony "Monte" Gaines that THORNE had a female fighting dog in heat who had killed two other dogs, and was in demand for breeding.

6. In a phone conversation on or about October 28, 2015, RICARDO GLENN "RIP" THORNE told unindicted conspirator Anthony "Monte" Gaines that THORNE had sold WEST

two fighting dogs, including one who lost "game" and "scratched dead" after a fight that lasted one hour and 37 minutes.

7.     In a phone conversation on or about November 9, 2015, RICARDO GLENN "RIP" THORNE told unindicted conspirator Anthony "Monte" Gaines that THORNE was able to make a lot of money from charging admission to dog fights that he held at a warehouse and did it for years but never got popped.

8.     In a phone conversation on or about November 10, 2015, RICARDO GLENN "RIP" THORNE told unindicted conspirator Anthony "Monte" Gaines that THORNE had a dog that won three fights at 18 months old, after he "rolled" her as a puppy with a guy in Waldorf.

9.     In a phone conversation on or about November 10, 2015, RICARDO GLENN "RIP" THORNE told unindicted conspirator Anthony "Monte" Gaines that THORNE does not drive his own car or bring his work ID with him to a dog fight because that was how other dog fighters had been caught.

10.     In and around April 2016, unindicted conspirator Rodriguez Norman asked unindicted conspirator Carlos Harvey to host a dog fight in King George County, Virginia.

11.     On or about April 3, 2016, TARRY JERON "TJ" WILSON traveled from Warsaw, Virginia, to attend a dog fight in King George, Virginia, hosted by unindicted conspirator Carlos Harvey.

12.     On or about June 1, 2016, DEREK AARON GARCIA notified unindicted conspirator Rodriguez Norman by direct message that unindicted conspirator Anthony "Monte" Gaines was among a group of eight individuals criminally charged with participating in a dogfighting ring.

13. On or about October 23, 2016, DEREK AARON GARCIA ("Fatal Attraction") posted to a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that GARCIA was going to enter his dog "Buggy" in a fight.

14. In and around November 2016, unindicted conspirator Rodriguez Norman entered his dog "Pablo" in a fight that, after 72 minutes, was won by "Pablo."

15. On or about December 13, 2016, DEREK AARON GARCIA ("Fatal Attraction") posted to a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" an offer to sell his fighting dog "Buggy" for $2,000.

16. In or around mid-December 2016, DEREK AARON GARCIA sold his fighting dog "Buggy" to unindicted conspirator Rodriguez Norman ("Tough Love") for about $1700.

17. On or about March 7, 2017, in response to an inquiry posted on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" by DEREK AARON GARCIA ("Fatal Attraction") regarding the status of fighting dog "Buggy", unindicted conspirator Rodriguez Norman ("Tough Love") told GARCIA that Buggy fought well.

18. On or about March 13, 2017, CHARLES EDWARD "CHUCKY" WILLIAMS, III ("Never Say Never") used a direct message to notify unindicted conspirator Rodriguez Norman ("Tough Love") that unindicted conspirator "Big Head" had been arrested.

19. On or about March 13, 2017, unindicted conspirator Rodriguez Norman ("Tough Love") messaged CHARLES EDWARD "CHUCKY" WILLIAMS, III that, in light of the arrest of "Big Head", TARRY JERON "TJ" WILSON should delete messages from the private group on the Telegram app generally referenced as "The DMV Board" or "The Board".

20. On or about March 13, 2017, CHARLES EDWARD "CHUCKY" WILLIAMS, III ("Never Say Never") messaged Norman ("Tough Love") that DEREK AARON GARCIA ("Fatal

11

Attraction") told TARRY JERON "TJ" WILSON ("City Limits") to delete the messages from the private group on the Telegram app generally referenced as "The DMV Board" or "The Board".

21.    On or about March 13, 2017, DEREK AARON GARCIA ("Fatal Attraction") instructed TARRY JERON "TJ" WILSON ("City Limits") how to delete the messages on the private group on the Telegram app generally referenced as "The DMV Board" or "The Board" without deleting the group from the Telegram app.

22.    On or about March 13, 2017, unindicted conspirator Rodriguez Norman ("Tough Love") messaged members of a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that, because the messages on the Board then in use by the conspirators could not be deleted without deleting the entire group from the Telegram app, the group would have to be deleted and a new one created on the app.

23.    On or about June 4, 2017, CHARLES EDWARD "CHUCKY" WILLIAMS, III ("Never Say Never") posted to an on-line website tracking pedigrees of fighting dogs a page with a photo and information for his fighting dog "Never Say Never Fish Grease" characterizing the dog as a two-time winner, having defeated Urban City's "Lulu" and COTC's "Mobetta".

24.    On or about June 18, 2017, RICARDO GLENN "RIP" THORNE ("Darkside") posted to a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" a description of a fighting dog that had won over $50,000, and noted that the most that he himself had ever won at one show was $15,000.

25.    On or about June 18, 2017, RICARDO GLENN "RIP" THORNE ("Darkside") posted to a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" a solicitation to arrange a fight for a 35-pound male dog.

12

26.     On or about June 18, 2017, DEREK AARON GARCIA ("Fatal Attraction") posted to a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" a detailed description of a dog fight he attended between "Hot Mouth Kennel's" "Alibaba" and "DRK's "Shake", that lasted two hours and 34 minutes.

27.     On or about June 19, 2017, DEREK AARON GARCIA ("Fatal Attraction") posted on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" bets of $100 each of two dog fights.

28.     On or about June 20, 2017, LARON MECCO "FROG" WEST ("Get Sick") posted on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that "we kill" fighting dogs that quit.

29.     On or about June 23, 2017, LARON MECCO "FROG" WEST ("Get Sick") posted on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" an offer of $2000 for a fight with a 36-pound female or a 41-pound male dog.

30.     On or about June 23, 2017, DEREK AARON GARCIA ("Fatal Attraction") posted to a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" a news article on the conviction of a defendant in a dogfighting case in Erie, Pennsylvania.

31.     On or about June 25, 2017, DEREK AARON GARCIA ("Fatal Attraction") notified the members of a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that he had posted on Facebook a "play-by-play" of a dog fight he and other conspirators attended, that was won by the dog "Eulogy" in one hour and 59 minutes.

32.     In a phone conversation on or about July 26, 2017, unindicted conspirator Rodriguez Norman asked CHARLES EDWARD "CHUCKY" WILLIAMS, III if WILLIAMS was going to attend a dogfight on July 29, 2017.

13

33.    In a phone conversation on or about July 26, 2017, unindicted conspirator Norman told CHARLES EDWARD "CHUCKY" WILLIAMS, III that an unindicted conspirator was training a 38-pound dog for Norman to enter in a fight, and that such individual had previously trained a champion fighting dog that, in one fight, fought for three hours and 16 minutes.

34.    On or about July 29, 2017, CHARLES EDWARD "CHUCKY" WILLIAMS, III traveled to Nanjemoy, Maryland, to watch the dog fights scheduled to occur that day, including one involving a dog owned by unindicted conspirator Rodriguez Norman.

35.    On or about July 29, 2017, unindicted conspirator Rodriguez Norman entered his dog "Pyrex" in a fight in Nanjemoy, Maryland, in place of his fighting dog "Pablo," because Pablo was injured, and Norman did not want to lose the "forfeit" fee.

36.    In a phone conversation on or about July 30, 2017, RICARDO GLENN "RIP" THORNE told unindicted conspirator Rodriguez Norman that THORNE was going to place bets on one of Norman's dogs.

37.    In a phone conversation on or about July 30, 2017, unindicted conspirator Rodriguez Norman asked CHARLES EDWARD "CHUCKY" WILLIAMS, III to train Norman's fighting dog "Bruiser" while unindicted conspirator Norman was out of town.

38.    In a phone conversation on or about August 2, 2017, DEREK AARON GARCIA agreed to watch Norman's fighting dogs for Norman while unindicted conspirator Rodriguez Norman went to Las Vegas.

39.    In a phone conversation on or about August 2, 2017, GARCIA told unindicted conspirator Rodriguez Norman that GARCIA had a 37-pound female he wanted to enter into a fight, but that GARCIA probably would fight the dog in New Jersey or the Carolinas because none of the members of the DMV Board had a female dog of the right weight for his dog to fight.

14

40. In a phone conversation on or about August 3, 2017, unindicted conspirator Rodriguez Norman and DEREK AARON GARCIA discussed fighting dogs Pablo, Bruiser, and dogfighting.

41. In a phone conversation on or about August 3, 2017, unindicted conspirator Rodriguez Norman and RICARDO GLENN "RIP" THORNE discussed a dog fight in North Carolina that SHABORN AMAR "SHY" NESBITT was going to host for Norman.

42. In a phone conversation on or about August 6, 2017, CHARLES EDWARD "CHUCKY" WILLIAMS, III asked unindicted conspirator Rodriguez Norman to post a proposed fight for a 44-pound male dog for $5,000, and a 35-pound female dog for $1,500.

43. In a phone conversation on or about August 12, 2017, CHARLES EDWARD "CHUCKY" WILLIAMS, III contacted unindicted conspirator Rodriguez Norman to find a dog to fight with WILLIAMS's 51-pound male dog.

44. On or about August 19, 2017, unindicted conspirator Carlos Harvey spoke by phone with unindicted conspirator Rodriguez Norman.

45. On or about August 19, 2017, unindicted conspirator Rodriguez Norman spoke by phone with SHABORN AMAR "SHY" NESBITT.

46. In a phone conversation on or about August 20, 2017, LARON MECCO "FROG" WEST told unindicted conspirator Rodriguez Norman that WEST had failed in an attempt to purchase a particular fighting dog because, after WEST asked the seller to show WEST the dog in a dog fight, the dog fought so well that the seller raised the price more than the original amount that WEST had agreed to pay.

47. In a phone conversation on or about August 21, 2017, unindicted conspirator Rodriguez Norman discussed breeding dogs with RICARDO GLENN "RIP" THORNE.

48.    On or about August 24, 2017, at a premises on St. Clair Drive, in Temple Hills, Maryland, unindicted conspirator Norman possessed three fighting dogs (one wearing a collar weighted with a sandbag); three pitbull puppies; and numerous items associated with an illegal animal fighting venture, including a treadmill with a hook to keep a dog on it; a fighting ring bearing traces of non-primate blood; syringe boxes; boxes of needles; a skin-staple pack; an IV-fluid kit; and performance enhancing pharmaceuticals commonly used to increase fighting potential in dogs trained for fighting, as well as to keep injured dogs fighting longer.

49.    On or about August 24, 2017, at a premises on Brothers Place, S.E., in Washington, D.C., unindicted conspirator Norman possessed seven fighting dogs, and numerous items associated with animal fighting, including lunge whips; dog pharmaceuticals; syringes; shock collars; chains; stakes; and skin-staple packs.

50.    On or about January 2, 2018, LARON MECCO "FROG" WEST posted to an on-line website tracking pedigrees of fighting dogs a page with a photo and information for his fighting dog "GET SICK'S H.I.V.", characterizing the dog as the offspring of "Tough Love's Big Bruiser 1XW".

51.    On or about March 10, 2018, LARON MECCO "FROG" WEST drove CHARLES EDWARD "CHUCKY" WILLIAMS, III to a warehouse on South 35th Street in Philadelphia, Pennsylvania, where WILLIAMS entered his dog into a dogfight attended by dozens of people.

52.    In or about July 2018, LARON MECCO "FROG" WEST kept one of his fighting dogs at property controlled by unindicted conspirator Carlos Harvey.

53.    On or about July 11, 2018, unindicted conspirator Carlos Harvey possessed at his residence 11 pit bull-type dogs, most of whom had scarring consistent with a dog fighting venture.

54.    On or about August 30, 2018, after unindicted conspirator Carlos Harvey obtained a new phone to replace the one seized from him by law enforcement, LARON MECCO "FROG" WEST approved Harvey to rejoin the private Telegram group generally referenced as "The DMV Board" or "The Board" through Harvey's new phone number.

55.    In a phone conversation on or about September 2, 2018, LARON MECCO "FROG" WEST discussed with Carlos Harvey a dogfight about which WEST had just learned.

56.    On or about October 15, 2018, TARRY JERON "TJ" WILSON ("City Limits") posted to a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" a photo in prison of unindicted conspirator Rodriguez Norman, and a solicitation for fights for a 37-pound male dog and a 33-pound female dog.

57.    On or about October 17, 2018, TARRY JERON "TJ" WILSON ("City Limits") provided on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" instructions to another dogfighter on how to kill their losing dog and offered to drive to the other dogfighter's house to hang the dog from a tree himself.

58.    On or about October 17, 2018, LARON MECCO "FROG" WEST ("Get Sick") notified a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that dogs that failed to fight aggressively enough had been killed. According to WEST:

> I love to throw the motherfuckers over the bridge into the water. But, uh, nah, you know, he lived too far. I ain't want to ride the motherfucking mutt with me just to throw it to the bridge. If they was closer, I would've went to the bridge and threw me over that mother fucker for sure.

59.    On or about October 17, 2018, TARRY JERON "TJ" WILSON ("City Limits") told LARON MECCO "FROG" WEST on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that the other dogfighter should have invited WILSON to come to his dog yard to kill the dogs, because, as WILSON said, he "loved" killing them, "[i]ts

17

like I'm killing somebody, man. I'll unplug it and hook them up. Unplug it and hook them up. I like killing motherfuckers. Them motherfuckers taking my money, feeding them food, taking my antibiotics and in my yard taking my deck."

60.    On or about October 17, 2018, defendant TARRY JERON "TJ" WILSON ("City Limits") stated on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that WILSON wanted to arrange a fight with two of their dogs in the weight range of 30 to 38 pounds.

61.    On or about October 18, 2018, CHARLES EDWARD "CHUCKY" WILLIAMS, III ("Never Say Never") agreed on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" to referee a dogfight.

62.    On or about October 24, 2018, RICARDO GLENN "RIP" THORNE ("Darkside") posted on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" an offer to arrange fights for his 36-pound male dog and his 40-pound male dog.

63.    During a discussion on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" on or about October 26, 2018, DEREK AARON GARCIA ("Fatal Attraction") and SHABORN AMAR "SHY" NESBITT ("The God I Am") advised unindicted conspirator "Andrew Dirttown" regarding the merits of acquiring the offspring of a fighting dog known as "Brooklyn", owned by a partner of unindicted conspirator Rodriguez Norman ("Tough Love").

64.    On or about October 30, 2018, SHABORN AMAR "SHY" NESBITT ("The God I Am") asked on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" whether RICARDO GLENN "RIP" THORNE ("Darkside") had posted on-line that he had a 41-pound male that he wanted to fight for $5,000.

18

65.    On or about October 30, 2018, RICARDO GLENN "RIP" THORNE ("Darkside") told SHABORN AMAR "SHY" NESBITT ("The God I Am") on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that THORNE already had a fight arranged for a 40-pound male for $5,000.

66.    On or about November 2, 2018, TARRY JERON "TJ" WILSON ("City Limits") warned members of the a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" to be sure to confirm the death of the dogs that they try to kill upon losing a fight, because one time he and CHARLES EDWARD "CHUCKY" WILLIAMS, III ("Never Say Never") thought that their dog had died in a fight, only to find that the dog returned to life; "we broke the box down, balled up the carpet . . . carry her out of the woods, put her in the truck. She wake up. I swear to God . . . ."

67.    On or about November 3, 2018, TARRY JERON "TJ" WILSON ("City Limits") told members of a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that he had a 37-pound male dog available to fight.

68.    On or about November 4, 2018, MICHAEL ROY HILLIARD ("No Dayz") told a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that he was interested in purchasing a 13–14-month-old female dog that already had been trained for fighting.

69.    In a phone conversation no or about December 2018, TARRY JERON "TJ" WILSON told Carlos Harvey about his plans to arrange a dogfight in January 2019, in Delaware.

70.    On or about January 2, 2019, RICARDO GLENN "RIP" THORNE ("Darkside") advised a private group on the Telegram app generally referenced as "The DMV Board" or "The

Board" that Darkside Kennels had been around for over 20 years, and that newer dogfighters should learn some "dogman etiquette."

71.    On or about January 2, 2019, SHABORN AMAR "SHY" NESBITT ("The God I Am") told a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that he "[j]ust won with three dogs. Got three dogs hooked right now too. Then when I get finished with those three, I have three more to hook. So whenever you get them weights, you just let me know."

72.    On or about January 2, 2019, SHABORN AMAR "SHY" NESBITT ("The God I Am") told a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that NESBITT did not need THORNE's advice, because NESBITT had "been in the game for 15 years, bro."

73.    On or about January 17, 2019, MICHAEL ROY HILLIARD ("No Dayz") asked on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" how TARRY JERON "TJ" WILSON was looking for an event on Saturday.

74.    On or about January 17, 2019, in response to a news article posted to a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" regarding an individual charged with running a dogfighting operation, TARRY JERON "TJ" WILSON ("City Limits") warned "People like dogs. They don't like what we doing to them, though, I bet you that."

75.    On or about January 19, 2019, in response to a question by a member of a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" regarding the correct procedure for a referee to follow at a dog fight, DEREK AARON GARCIA ("Fatal Attraction") posted on DMV Board the correct procedure for a referee to act in a dogfight, with

20

which CHARLES EDWARD "CHUCKY" WILLIAMS, III ("Never Say Never") and SHABORN AMAR "SHY" NESBITT ("The God I Am") agreed.

76.    On or about January 19, 2019, CHARLES EDWARD "CHUCKY" WILLIAMS, III ("Never Say Never") complained on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that unindicted conspirator "Big Fist" was putting a "play-by play" of a fight between dogs owned by "Big Fist" and TARRY JERON "TJ" WILSON ("City Limits") on the wrong board.

77.    On or about January 19, 2019, at approximately 11:10 p.m., in response to a question posed by LARON MECCO "FROG" WEST ("Get Sick") as to whether the fight involving WILSON's dog was yet over, unindicted conspirator "Big Fist" told a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that there were no "fat ladies yet," meaning the fight was not over yet.

78.    On or about January 19, 2019, after his dog lost a fight in Delaware that lasted one hour and 12 minutes, TARRY JERON "TJ" WILSON ("City Limits") shot and killed the dog after she thwarted his attempt to electrocute her.

79.    On or about January 20, 2019, CHARLES EDWARD "CHUCKY" WILLIAMS, III ("Never Say Never") congratulated TARRY JERON "TJ" WILSON ("City Limits") on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" for entering his dog in the fight the previous night.

80.    In a phone conversation on or about February 3, 2019, LARON MECCO "FROG" WEST ("Get Sick") told Carlos Harvey that WEST was trying to obtain a new 39- or 40-pound dog to enter into a fight in June 2019.

81.     On or about February 8, 2019, DEREK AARON GARCIA ("Fatal Attraction") encouraged unindicted conspirator "4Bhead" on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" to support unindicted conspirator "Abstract" in an upcoming dogfight.

82.     During a discussion on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" on or about February 8, 2019, DEREK AARON GARCIA ("Fatal Attraction") offered to bet conspirator "4BHead" $100 that a dog fight involving a dog belonging to conspirator "Abstract" would last at least 30 minutes.

83.     During a discussion on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" on or about February 10, 2019, DEREK AARON GARCIA ("Fatal Attraction"), CHARLES EDWARD "CHUCKY" WILLIAMS, III ("Never Say Never"), and SHABORN AMAR "SHY" NESBITT ("The God I Am") watched and discussed on the DMV Board a dog fight won by a dog owned by unindicted conspirator "Abstract."

84.     On or about February 10, 2019, CHARLES EDWARD "CHUCKY" WILLIAMS, III ("Never Say Never") told a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that one of the dogs of MICHAEL ROY HILLIARD ("No Dayz") was real "high intense", "made all his spots," and was going to "be alright."

85.     On or about April 6, 2019, CHARLES EDWARD "CHUCKY" WILLIAMS, III, MICHAEL ROY HILLIARD, and Carlos Harvey drove through Fairfax, Prince William, and Stafford Counties along I-95 in Virginia, with a dog belonging to WILLIAMS, so that WILLILAMS could enter the dog in a dog fight in Bunnlevel, North Carolina.

86. On or about April 6, 2019, in Bunnlevel North Carolina, CHARLES EDWARD "CHUCKY" WILLIAMS, III, entered his dog in a dog fight that was referred by SHABORN AMAR "SHY" NESBITT, and attended by, among others, MICHAEL ROY HILLIARD and Carlos Harvey.

87. On or about April 6, 2019, after a dog fight that lasted less than 10 minutes before being won by the dog belonging to CHARLES EDWARD "CHUCKY" WILLIAMS, III, an unindicted conspirator shot and killed the dog that lost the fight.

88. In a phone conversation on or about May 28, 2019, LARON MECCO "FROG" WEST told Carlos Harvey of his attempt to schedule a dog fight with an individual who kept changing the timing of the fight.

89. On or about June 4, 2019, MICHAEL ROY HILLIARD ("No Dayz") told CHARLES EDWARD "CHUCKY" WILLIAMS, III ("Never Say Never") on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" that HILLIARD wanted to travel to North Carolina to attend WILLIAMS's next dog fight.

90. During a discussion on a private group on the Telegram app generally referenced as "The DMV Board" or "The Board" on or about June 4, 2019, TARRY JERON "TJ" WILSON ("City Limits") solicited fights for a 44-pound female dog and a 48 to 50-pound male dog.

91. On or about June 15, 2019, CHARLES EDWARD "CHUCKY" WILLIAMS, III attended a dogfight in Woodbridge, Virginia, between dogs owned by unindicted conspirators "Abstract" and "Deep in the Game."

92. On or about June 19, 2019, defendant TARRY JERON "TJ" WILSON possessed dogfighting materials at his residence in Warsaw, Virginia.

23

93.     On or about July 23, 2019, LARON MECCO "FROG" WEST trained his fighting dog "Lil Charlie" at the house of RICARDO GLENN "RIP" THORNE, in Camp Springs, Maryland, in preparation for a dog fight in Delaware on August 3, 2019.

94.     In a phone conversation on or about July 24, 2019, LARON MECCO "FROG" WEST told Carlos Harvey how WEST has his fighting dogs on steroids.

95.     On or about July 30, 2019, RICARDO GLENN "RIP" THORNE possessed at his residence in Camp Springs, Maryland, dog fighting instruments including breeding stands, flirt poles, medical aid materials, dog pedigree information, scales and weighted collars, and nine Pit Bull type dogs, many with scarring patterns and lacerations consistent with animal fighting.

96.     On or about November 21, 2019, DEREK AARON GARCIA secured a dog to a treadmill for purposes of building up its strength and stamina for a dog fight.

97.     On or about August 20, 2020, TARRY JERON "TJ" WILSON possessed at his residence in Warsaw, Virginia, eight pit-bull type dogs (including four that bore scarring patterns that indicated previous involvement in dogfighting), and a cell phone containing nine videos depicting WILSON engaged in dogfighting, including two depicting CHARLES EDWARD "CHUCKY" WILLIAMS, III engaged in dog fighting.

(All in violation of Title 18, United States Code, Section 371.)

## COUNTS TWO THROUGH FOUR

### (Handling Dogs for Participation in an Animal Fighting Venture)

A. The general allegations of this Indictment are re-alleged and incorporated into this Count as though fully set forth herein, as well as the Overt Acts referenced below.

B. On or about the following dates, in the locations listed below in the Eastern District of Virginia and elsewhere, the following defendants did unlawfully and knowingly possess, train, transport, deliver, and receive dogs for purposes of having the dogs participate in an animal fighting venture, as referenced in the Overt Acts listed below:

| Count | Defendant(s) | Date | Location | Overt Act(s) |
|---|---|---|---|---|
| 2 | LARON MECCO "FROG" WEST | July 2018 | King George County, Virginia | 52 |
| 3 | TARRY JERON "TJ" WILSON | January 19, 2019 | Warsaw, Virginia | 76-79 |
| 4 | CHARLES EDWARD "CHUCKY" WILLIAMS, III | April 6. 2019 | Fairfax, Prince William, and Stafford Counties, Virginia | 85-87 |

(All in violation of Title 7, United States Code, Section 2156(b), and Title 18, United States Code, Section 49.)

25

## COUNT FIVE

*(Advertising a Dog For Use in an Animal Fighting Venture)*

A. The general allegations of this Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B. On or about October 30, 2018, in Woodbridge in the Eastern District of Virginia and elsewhere, defendant RICARDO GLENN "RIP" THORNE did unlawfully and knowingly use an instrumentality of interstate commerce for commercial speech for purposes of advertising an animal for use in an animal fighting venture, promoting or in any other manner furthering an animal fighting venture, by making the following advertisement on the Internet through the Telegram app, to wit, THORNE offered $5000 for a fight for a 41-pound dog.

(All in violation of Title 7, United States Code, Section 2156(c), and Title 18, United States Code, Section 49.)

A TRUE BILL:

Pursuant to the E-Government Act,,
The original of this page has been filed
under seal in the Clerk's Office

FOREPERSON OF THE GRAND JURY

Jessica D. Aber
United States Attorney

By: _____
Gordon D. Kromberg
Assistant United States Attorney

26